**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE**


Mark J. Kenna, Jr.


     v.                                        Civil No. 04-cv-232-JM

Hartford Life & Accident
Insurance Co.


## O R D E R


    Plaintiff Mark J. Kenna, Jr. ("Kenna") sued Defendant
Hartford Life & Accident Insurance Company ("Hartford") asserting
that Hartford's denial of his claim for long-term disability
benefits violated the Employee Retirement Income Security Act of
1974 ("ERISA"), 29 U.S.C.A. § 1001, et seq.  Hartford moves for
summary judgment.  Kenna filed an objection.

    There are two issues that must be addressed in this case:
(1) whether Hartford's determination that Kenna was not disabled
was arbitrary and capricious; and (2) whether a civil penalty
should be imposed against Hartford for failing to provide Kenna
certain welfare benefit plan documents.  For the reasons set
forth below, the Court rules in Hartford's favor on both issues.
Accordingly, Hartford's motion for summary judgment is granted.

Background[1]

Kenna was employed as a Product Manager at Arris Group, Inc. ("Arris") before he filed his claim for long-term disability benefits.  Admin. R. 303.  Arris provided a long-term disability plan for its employees the benefits of which were funded by an insurance policy (the "Policy").  See Df.'s Ex. B.

A.   Disability Provisions

Plan participants are advised that disability benefits become payable if a participant meets the following conditions:

1. you become Disabled while insured under this plan;

2. you are Disabled throughout the Elimination Period;[2]

3. you remain Disabled beyond the Elimination Period;

4. you are, and have been during the Elimination Period, under the Regular Care of a Physician; and

---

[1]Hartford submitted its Claim File, which the Court treats as the Administrative Record ("Admin. R."), as Defendant's Exhibit A in support of the motion for summary judgment. Although the relevant Hartford insurance policy is included in the Claim File, Hartford submitted separately a copy of the policy as Defendant's Exhibit B for ease of reference.  The background facts set forth herein are taken from the Claim File except when citing to the applicable policy terms.

[2]The Elimination Period refers to a period of time that a participant must be disabled before disability benefits become payable.  Df.'s Ex. B. at 4.  That period is the longer of (1) 180 consecutive days or (2) the period of time that an employer is obligated to pay short-term disability benefits.  Id.

5. you submit Proof of Loss satisfactory to us.[3]

Df.'s Ex. B at 7.

B.   Coverage Termination Provisions

Under the terms of the Policy, a participant's coverage terminates if the participant ceases to be an Active Full-time Employee including the following circumstances: temporary layoff, leave of absence, or a general work stoppage.  Df.'s Ex. B. at 16.  The Policy provides, however, that if an employee becomes "Disabled," and thereby ceases to be an "Active Full-time Employee," the employee's coverage will be continued for the following periods: (1) during the Elimination Period while the employee remains Disabled by the same Disability; and (2) after the Elimination Period for as long as the employee is entitled to benefits under the Policy.  Id.

C.   Kenna's Claim for Long-Term Disability Benefits

1.   Application for Benefits

Hartford received Kenna's application for long-term disability benefits on July 1, 2003.  Admin. R. at 303-15.  The last day that Kenna worked at Arris was November 7, 2002.  Id. at

---

[3]The terms "We/Us/Our" our defined in the Policy to mean Hartford.  Df.'s Ex. B at 60.

303.  Kenna started a leave of absence under the Family and Medical Leave Act on November 8, 2002.  Id.  His employment terminated on February 28, 2003 when the facility closed.  Id.

Kenna stated in the application that the first symptoms of his illness were "loss of temperature sensation on left leg." Id. at 309.  He stated that he was unable to work because his "pain level interferes with focus and concentration."  Id.  Kenna submitted a list of treating physicians that included Dr. Jonathan Thyng, his primary care physician, Dr. Wesley Wallace, an orthopedist, Drs. Keith McAvoy and Elijah Stommel, neurologists, and Drs. James Mirazita, Praveen Suchden and Lan Nguyen-Knoff of the Center for Pain Solutions.  Id. at 310.

Dr. Thyng completed an attending physician statement ("APS") that was included in Kenna's application.  Id. at 314-315.  In the APS, Dr. Thyng stated that Kenna's primary diagnosis was "neuropathy[4] – left lower extremity."  Id. at 314.  Kenna's subjective symptoms were "severe pain in left leg," which Dr. Thyng indicated rendered Kenna unable to work.  Id.  Dr. Thyng identified various tests that Kenna had undergone with summarized

_____

[4]The term "neuropathy" refers to "a disease involving the cranial nerves or autonomic nervous system."  Stedman's Medical Dictionary ("Stedman's") 1211 (27th ed. 2000).

4

results.  Id.  He noted that Kenna's physical examination
findings were midline tenderness at the lower LS spine and absent
deep tendon reflex in the left patella.  Id.  Dr. Thyng noted
that Kenna had been referred to other physicians and treated with
steroid injections, Neurontin, and anti-inflammatories all
without much success.  Id.

Arris indicated on the application that the physical
aspects of Kenna's job required occasional standing, walking and
sitting and that the job could be performed by alternating
sitting and standing.  Id. at 304.  Dr. Thyng reported that
Kenna's illness resulted in his ability to stand being restricted
to five to ten minutes.  Id. at 315.  His ability to walk was
noted to be restricted by both his lower left extremity
neuropathy and left knee pain.  Id.  Dr. Thyng further indicated
that Kenna's walking was very limited due to his pain.  Id.
Regarding Kenna's ability to sit, Dr. Thyng stated that he
required frequent position changes and could not sit through
meetings.  Id.  Dr. Thyng stated that it was uncertain how long
Kenna's physical limitations would last.  Id.

    2.  Kenna's Medical Records

On July 5, 2002, Kenna reported to Dr. Thyng that he had a

problem with left leg pain dating back to the early 1990s that had progressively worsened.  Id. at 219.  Kenna reported a history of "loss of temperature sensation throughout the left leg, however, more recently he has begun to experience more pain throughout the left leg."  Id.  Kenna reported that he had back surgery in the early 1990s, but he had no real back pain except for "an occasional slight twinge."  Id.  Dr. Thyng observed that Kenna was under no apparent distress.  Id.  His straight leg raises were normal bilaterally, as was his motor strength.  Id. However, his deep tendon reflex was absent at the left patella. Dr. Thyng diagnosed a "probable radiculopathy"[5] of the lower left leg.  Id.  An X-ray conducted on July 5, 2002, showed "significant disc space narrowing and subchondral scelerosis and osteophyte formation at the L4-5 level compatible with degenerative disc disease."  Id. at 221.  There was also degenerative disc disease at the L5-S1 level and at the L3-4. Id.  There was "no evidence of acute process."  Id.

Dr. Wallace saw Kenna on July 19, 2002.  Id. at 217.  Dr. Wallace observed that Kenna had good mobility of the lumbar

---

[5]The term "radiculopathy" refers to a disorder of the spinal nerve roots.  Stedman's at 1503.

spine, was able to walk on toes and heels, had negative straight
leg raises to 90 degrees and symmetrical and intact reflexes.
Id.  Dr. Wallace assessed Kenna as having "chronic back pain and
[a] neurological issue."  Id.

    Kenna underwent an MRI on August 8, 2002.  Id. at 231.  The
MRI showed a small disk protrusion at the L5-S1 level on the
right side, which was noted as possibly affecting the S1 nerve
root.  Id.  There was also a notation of some mild narrowing of
the spinal canal at the L4-5 level.  Id.

    On August 30, 2002, Kenna saw Dr. McAvoy.  Id. at 214-216.
Dr. McAvoy noted that Kenna was "alert and oriented" and that his
"mental status is intact in that he presents his history in a
clear and concise manner."  Id. at 215.  Kenna's motor strength
appeared to be "5/5 throughout" and "his gait [was] steady."  Id.
Dr. McAvoy noted decreased pinprick and temperature sensation
"involving the entire left lower extremity and up to about the T7
level on the left side of his torso."  Id.  Kenna had decreased
deep tendon reflexes in both legs.  Id.  Dr. McAvoy found that a
review of the existing neuroimaging data showed a possible "bone
spur at the level of T6-T7 on the right side, but this did not
appear to be pressing on the cord in any way."  Id.

In his assessment, Dr. McAvoy opined that "[c]ertainly we may be dealing with a myelopathy[6] in this patient."  Id.  He further noted that "[t]here is an abnormality at the level of T6-7 extra-axial to his cord, which may represent a bone spur, but this does not appear to be impinging upon the cord at all."  Id.  Dr. McAvoy ordered further tests, including an MRI of the cervical spine and testing of nerve impulses.  Id.

An MRI of Kenna's cervical spine was done on September 17, 2002.  Id. at 210.  The MRI revealed "some arthritic type changes at multiple levels but no definitive cord compression to explain his symptoms."  Id.  The following month, an MRI of Kenna's head revealed "some nonspecific white matter changes only consistent with mild microvascular ischemic disease."  Id. at 212.  Dr. McAvoy noted that this would not explain his leg symptoms.  Id.

Kenna returned to see Dr. McAvoy on November 8, 2002 stating that his symptoms had gotten worse.  Id. at 210.  Dr. McAvoy reported that Kenna did not feel that there was any persistent weakness in lower left leg, but he continued to have neuropathic burning-type of pain in the left leg.  Id.

---

[6]The term "myelopathy" refers to a disorder of the spinal cord.  Stedman's at 1171.

In his November 8, 2002 notes, Dr. McAvoy recounted the results of Kenna's MRIs, and he noted that "evoked potentials" of Kenna's lower extremities had been conducted and were "somewhat nonspecific and showed an abnormality somewhere between the lumbar region and his head." Id. Dr. McAvoy observed that Kenna's motor strength appeared to be 5/5 including the left lower extremity. Id. His reflexes were absent in the lower extremity. Id. Dr. McAvoy assessed Kenna as having "dysesthetic pain involving the left lower extremity of unclear etiology." Id. Dr. McAvoy concluded his notes with the following comment: "This patient is experiencing quite a bit of pain now, and it is affecting his work, so I will keep him out of work until further notice, until we complete the workup and/or I have him undergo another opinion at the Medical Center up North." Id. at 211.

On November 25, 2002, Dr. McAvoy indicated in the attending physician section of a short-term disability claim form that the cause of Kenna's disability was "dysesthetic pain left torso and left lower extremity of unclear etiology." Id. at 130. Dr. McAvoy stated that Kenna had been "continuously and totally disabled from 11/8/02 through the present." Id. He was unable to estimate when Kenna could return to work. Id. Dr. McAvoy

also completed a health care provider certification on November
25, 2002, stating that Kenna "reports that he is in too much pain
to return to work at all." Id. at 131.  Dr. McAvoy stated that
Kenna "is to be incapacitated for any regular gainful employment
due to his pain, duration is indefinite." Id.

On November 27, 2002, Dr. McAvoy reported the results of his
study to "look for evidence of an entrapment neuropathy versus
radiculopathy." Id. at 208.  This included an electomyography
("EMG"), motor nerve conduction studies, sensory nerve
conductions, and a needle examination. Id.  Dr. McAvoy concluded
that "[t]his is an abnormal study indicative of chronic left L5
radiculopathy." Id. at 209.  He indicated that he would get
Kenna's recent MRI of his LS spine to determine whether there was
"a neural foraminal compromise" at the level of L5. Id.

Dr. Thyng noted on January 24, 2003 that results were
pending from a CT Myelogram that Kenna had two days prior. Id.
at 254.  On February 26, 2003, however, Dr. Thyng noted that the
CT Myelogram "apparently didn't show any lesions." Id. at 261.
That same day, Kenna reported that he seemed "to be losing more
sensation" in his lower left leg, which occasionally made him
feel off balance and led to several falls. Id.  Kenna also

reported that he was "finding it harder to focus on things at work due to the burning discomfort in his leg." Id.

In a health status certificate dated February 26, 2003, Dr. Thyng wrote: "Advise that Mr. Kenna be removed from work status while undergoing further evaluation + work-up." Id. at 136. Dr. Thyng gave a tentative return to work date of March 12, 2003. Id. On March 10, 2003, however, Dr. Thyng completed another health status certificate indicating: "Recommend no work pending further evaluation. Plan re-evaluation in 2 weeks." Id. at 137.

In a visit to Dr. Thyng on March 21, 2003, Kenna noted that he had stopped taking Neurontin about one week prior because he "didn't think that it was doing very much." Id. at 199. Kenna reported that he was losing sensation in his leg. Id. He described the discomfort as a burning sensation. Id. Dr. Thyng reported that Kenna found it difficult "to concentrate and focus at work due to his pain and discomfort." Id. Dr. Thyng noted that Kenna's workup had been negative to date, and that he was in no apparent distress, but had mild tenderness in certain areas. Id. Dr. Thyng increased Kenna's Neurotin dosage and referred him to neurology for further evaluation. Id. at 200.

Dr. Stommel saw Kenna on March 24, 2003. He observed that

Kenna's EMG "showed evidence of active denervation in the left L4-L5 and L5-S1 paraspinal muscles which have some more distal L4-L5 and L5-S1 active denervation in the left leg." Id. at 196. He noted, however, that Kenna's subsequent MRI of his lumbosacral spine "demonstrated no significant root impingement." Id. Dr. Stommel further noted that Kenna's CT myelogram demonstrated no obvious abnormality. Id. Dr. Stommel found that Kenna had a "normal mental status," and that he had no "focal weakness, nor any significant atrophy." Id. Dr. Stommel reported that Kenna "underwent some abbreviated nerve conduction studies," from which Dr. Stommel concluded that he had "an L4 and possibly L5-S1 radiculopathy on the left." Id. Dr. Stommel opined that his and Dr. McAvoy's studies "suggest that the origin of the problem is nerve root compression," but that "[u]nfortunately, imaging studies have not corroborated this." Id.

Kenna made six visits to the Center for Pain Solutions beginning on April 1, 2003. Id. at 275-285. On April 1st, Dr. Lan Nguyen-Knoff observed that Kenna was a "[p]leasant appearing patient in no acute distress." Id. at 284. She indicated that Kenna's mental status was alert and oriented. Id. at 285. He had 5/5 strength in all limbs, but reported numbness in his lower

left leg.  Id.  And he had symmetrical deep tendon reflexes.  Id.
Dr. Nguyen-Knoff's assessment was unspecified neuralgia,
neuritis, or radiculitis.[7]  Id.  Dr. Nguyen-Knoff observed that
Kenna symptoms are "peculiar."  Id.  She recommended a trial of
steroid injections and started Kenna on Topomax.  Id.

Kenna had lumbar epidural steroid injections on April 9 and
May 7, 2003.  Id. at 282-283.  He reported minimal relief after
the first injection and no relief after the second injection.
Id. at 281-282.  Kenna was twice advised to restart Topomax,
which he had stopped after short trials.  Id. at 279-280.

Kenna followed up with Dr. Thyng on April 15, 2003.  Id. at
194.  Dr. Thyng noted that Kenna had again stopped taking
Neurontin.  Id.  Kenna reported that he walked daily for
exercise, but that was getting more problematic with leg pain.
Id.  Dr. Thyng noted that Kenna looked very uncomfortable that
day and was limping due to the left lower extremity pain.  Id. at
195.  He reported that Kenna's mental status was grossly normal.
Id.  Dr. Thyng noted that a Pain Solutions evaluation was in

---

[7]The term "neuralgia" refers to "pain of a severe,
throbbing, or stabbing character in the course or distribution of
a nerve."  Stedman's at 1206.  The term "neuritis" refers to
inflammation of a nerve.  Id. at 1207.  The term "radiculitis" is
a synonym for radiculopathy.  Id. at 1503.

progress, and that Kenna was "unable to work at this time due to the severity of his pain and his inability to concentrate." Id.

In a letter dated April 19, 2003, Dr. McAvoy noted that since he had last seen Kenna, another neurologist, Dr. Stommel, had performed an EMG that resulted in findings similar to those Dr. McAvoy found. Id. at 140. Dr. McAvoy opined that the abnormalities of Kenna's EMG, and his clinical presentation, supported keeping Kenna out of work indefinitely. Id.

D. Hartford's September 2003 Denial of Kenna's Claim

While reviewing Kenna's claim, Hartford's occupational analysis of his job determined that it was sedentary and that its essential functions were equivalent to those required of a "Product Development Manager" as defined by the U.S. Department of Labor. Id. at 286. Hartford asked Dr. William Sniger, Board-certified in Physical Medicine and Rehabilitation, to review Kenna's medical record and speak with his physician in order to determine Kenna's functional capacity to perform sedentary work. Id. at 155, 158.

Dr. Sniger noted in his medical report that Dr. Thyng informed Dr. Sniger that there were no significant objective findings to support Kenna's persistent complaints of pain. Id.

14

at 153.  Dr. Thyng also informed Dr. Sniger that there were no objective findings to support Kenna's complaints of impaired concentration resulting from his pain.  Id.  Dr. Thyng opined that Kenna's inability to perform sedentary work was supported from a subjective prospective, but not from an objective prospective.  Id.

Reviewing the medical evidence, Dr. Sniger noted that Kenna's MRIs showed formaminal narrowing, but no evidence of cord compression.  Id. at 158.  He found that the electrodiagnostic studies conducted had been inconsistent.  Id.  Dr. Sniger observed that "there was no indication of PSW's or fibrillations on needle exam, which would be a good indicator of radiculopathy."  Id. at 158.  Dr. Sniger further noted that Kenna's physicians found that his muscle strength, motor strength, and gait were normal.  Id.

With regard to Kenna's claim that he was unable to work due to impaired concentration secondary to pain, Dr. Sniger noted that no neuropsychological testing or other objective testing had been done to substantiate a cognitive impairment.  Id.  Dr. Sniger further noted that Drs. McAvoy and Stommel both noted that Kenna's mental status exam was normal.  Id.  Based on his review

15

of the medical record and his conversation with Dr. Thyng, Dr. Sniger concluded that Kenna had the functional capacity to perform sedentary work on a full-time basis.  Id.

Hartford denied Kenna's claim for long-term disability benefits in a letter dated September 17, 2003.  Id. at 148-152. Hartford indicated in its letter that it determined that the evidence Kenna submitted in support of his claim did not establish that he met the Policy definition of "Totally Disabled."  Id. at 148.  Hartford noted that Kenna's occupation was determined to be sedentary.  Id. at 150.  Hartford noted that although Kenna reported a history of leg pain, there were no new findings in the medical evidence at the time he ceased working. Id. at 151.  Kenna's physicians neither found that Kenna had any problems with concentration, nor was any psychological testing performed.  Id.  And Hartford noted Dr. Sniger's opinion and his letter to Dr. Thyng confirming that there had been no significant objective findings pertaining to Kenna's illness or claim of impaired concentration.  Id.

    E.    Kenna's Appeal of Hartford's Denial

Kenna appealed Hartford's decision by letter dated October 30, 2003.  Id. at 125-144.  He submitted documents from his

physicians that he had submitted in support of a successful claim
for short-term disability benefits.  Id. at 129-144.  Kenna also
requested that Hartford provide: "a copy of the Summary Plan
Description . . . a complete copy of the long-term disability
plan . . . [and] a copy of the Arris Group, Inc. policy booklet."
Id. at 125.

Enclosed with letters sent in November 2003, Hartford
provided copies of the Arris Group, Inc., Long Term Disability
Policy booklet and copies of Kenna's entire claim file.  Id. at
120, 121.  Hartford informed Kenna that it did not have copies of
the Summary Plan Description and directed him to contact Arris
Group, Inc. to obtain a copy of that document.  Id.  There is no
evidence that Kenna either again sought a copy of the Summary
Plan Description from Hartford, or that he was unable to obtain a
copy of it from Arris Group, Inc.

In January 2004, Kenna provided Hartford a report of an
independent medical examination that he underwent on September
16, 2003 conducted by Dr. Jeffrey Rind.  Id. at 84-87.
In his report, Dr. Rind found that Kenna presented "with
decreased sensation to pin, temperature and vibration in the left
lower extremity involving essentially the entire limb . . . ."

Id. at 82.  Dr. Rind observed that when Kenna was not looking, Dr. Rind "did notice that he seemed to have some spasm, or at least pain in the left lower extremity as he ambulated." Id. at 83.  Dr. Rind opined that: "I do not believe at this time he could meet the physical demands and duties of his current occupation because of the distractibility of the pain (I witnessed some of the distraction when he did not know he was being observed)." Id. at 83.

During the appeal of Kenna's claim, Hartford sent a questionnaire to Arris' Human Resources Department to clarify Kenna's last date worked and when the Arris facility where he formerly worked closed. Id. at 43-44, 113-114.  Arris responded that Kenna took sick/personal days from November 8-11, 2002 and received short-term disability benefits from November 14, 2002 through February 28, 2003. Id. at 110-112.  Arris further stated that employees at the facility where Kenna worked were notified that the facility would be closing on October 30, 2002. Id. at 111.  Some employees were released on November 30, 2002, but most were released by December 31, 2002. Id.  The facility closed on February 28, 2003. Id.

Hartford asked another independent medical reviewer, Dr.

18

Brian Mercer, a board-certified neurologist, to undertake the
following tasks in consideration of Kenna's appeal: (1) contact
Dr. McAvoy and ask how pain limited Kenna's daily activities; (2)
comment on significant medical findings; (3) opine whether the
medical evidence supported a significant change in Kenna's
medical condition around the time he ceased work; (4) identify
and assess functional limitations that were present when Kenna
ceased working.  Id. at 67-68.  Dr. Mercer conducted a review and
prepared a report.  Id. at 66-77.

     Dr. Mercer attempted to speak with Dr. McAvoy about his
opinion, but Dr. McAvoy responded through his office that he
would only respond to written questions.  Id. at 73.  According
to Dr. Mercer, however, Dr. McAvoy never responded to written
questions that he later posed.  Id. at 73, 76-77.

     In his subsequent report, Dr. Mercer opined that it was
likely that Kenna did have either a myelopathy or radiculopathy
causing his lower left leg symptoms, but that a myelopathy was
more likely.  Id. at 73.  Dr. Mercer noted that his review of the
raw data from Kenna's March 2003 EMG "showed only increased
polyphasia with normal motor unit duration and no evidence of
acute denervation.  This finding is relatively nonspecific and

19

unto itself does not clearly establish a radicular lesion." Id.
Dr. Mercer later noted that Kenna's "extensive radiology studies
have not shown any clear evidence of nerve root compression."
Id. at 74.

Dr. Mercer found that Kenna's reports of increasing pain and
discomfort notwithstanding, "his examination has not shown
increasing objective abnormalities to correlate with his reported
increased symptomatology." Id. Rather, Dr. Mercer found that
Kenna's August 2002 examination showed more abnormalities than
his November 2002 examination. Id. Dr. Mercer noted that in
November 2002 Kenna was observed to have symmetrical reflexes,
and that he continued to have normal strength and a normal gait
at both visits. Id.

Dr. Mercer opined that the "medical evidence does not
support any objective significant change in Mr. Kenna's medical
condition in November of 2002 at the time he had a change in
status from working to non-working." Id. at 75. Dr. Mercer
noted that Kenna's independent medical examination showed that
Kenna used as walker as of September 2003, but Dr. Mercer found
no increased objective findings to correlate with his reported
increased symptoms. Id.

Similarly, Dr. Mercer found that "there is no objective data to support that [Kenna's] concentration/cognitive function is being impaired by his pain to the extent that it would preclude working." Id. Dr. Mercer concluded that "[o]n an objective basis, the medical records do not include information that would preclude functioning at a full-time sedentary level with an opportunity to change position as necessary." Id.

F. Hartford's Final Denial

Relying on Dr. Mercer's opinion, Hartford upheld its September 2003 denial in a letter dated January 29, 2004. Id. at 60-65. Hartford noted Dr. Mercer's finding that Kenna's report of increased pain and discomfort that led him to stop working were not substantiated by clinical findings of increased abnormalities. Id. at 63. Hartford also noted Dr. Mercer's finding that there was no clinical evidence to support Kenna's claim that he had concentration or cognitive difficulties that would have precluded him from working. Id. Hartford concluded that "the clinical evidence did not support a worsening of Mr. Kenna's long-standing medical condition to explain a decrease in his functional status and inability to work." Id.

Hartford stated that while the medical evidence supported

Kenna's need to change positions as a result of his condition, his job allowed him the opportunity to alternate between occasionally standing, walking and sitting.  Id.  Additionally, Hartford stated that its Rehabilitation Clinical Case Manager found that as performed in the general workplace, Kenna's occupation would allow for flexibility in positions.  Id.  Hartford concluded that Kenna's condition would not have prevented him from performing the essential duties of his occupation as a required for a determination that Kenna suffered a Total Disability under the Policy.  Id.

Hartford stated that in reviewing Kenna's appeal, it had considered the findings from Kenna's independent medical examination.  Id.  Hartford noted that Dr. Rind indicated that Kenna's "functional status [had] worsened, as he required the use of a walker at the time of the September 16, 2003 evaluation." Id.  However, Hartford noted that there was no evidence that Kenna had "any gait difficulties or weakness during examinations around the time he ceased working."  Id.  Hartford concluded that to the extent that Kenna may have had a disability as of September 2003, it was not covered by the terms of the policy since his long-term disability coverage terminated after January

22

30, 2003.  Id.  After that date, Kenna ceased to be an Active
Full-time employee and his twelve week leave of absence under the
Family and Medical Leave Act had ended.   Id.

Kenna commenced this lawsuit after Hartford denied his
appeal.

Standard of Review

A.   Arbitrary and Capricious Standard

When a denial of benefits is challenged under ERISA pursuant
to 29 U.S.C.A. § 1132(a)(1)(B), "the standard of review depends
largely upon whether 'the benefit plan gives the administrator or
fiduciary discretionary authority to determine eligibility for
benefits or to construe the terms of the plan.'" Leahy v.
Raytheon Co., 315 F.3d 11, 15 (1st Cir. 2002) (quoting Firestone
Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989)).  If the
benefit plan "reflects a 'clear grant of discretionary authority
to determine eligibility for benefits,'" a decision to deny
benefits is reviewed to determine whether the administrator acted
arbitrarily and capriciously.  Matias-Correa v. Pfizer, Inc., 345
F.3d 7, 11 (1st Cir. 2003) (quoting Leahy, 315 F.3d at 15).
Under that standard, "the administrator's decision must be upheld
if it is reasoned and supported by substantial evidence."  Gannon

v. Metro. Life Ins. Co., 360 F.3d 211, 213 (1st Cir. 2004)

(citing Vlass v. Raytheon Employees Disability Trust, 244 F.3d

27, 30 (1st Cir. 2001)).  The court considers the record as a

whole reviewing the evidence that was before the administrator

when the decision under judicial review was made.  Cook v.

Liberty Life Assur. Co., 320 F.3d 11, 19 (1st Cir. 2003).

"Evidence is substantial if it is reasonably sufficient to

support a conclusion, and the existence of contrary evidence does

not, in itself, make the administrator's decision arbitrary."

Gannon, 360 F.3d at 213 (citation omitted).

Kenna admits that the policy at issue vests Hartford with

the discretionary authority to determine eligibility for

benefits.  See Pl.'s Objection at 6.  In fact, the policy terms

expressly provide that Hartford has "full discretion and

authority to determine eligibility for benefits and to construe

and interpret all terms and provisions of the Policy."  See Df.'s

Ex. B at 57.  Therefore, the arbitrary and capricious standard of

review presumptively applies to this case.  See Brigham v. Sun

Life of Can., 317 F.3d 72, 80–81 (1st Cir. 2003) (if the ERISA

plan documents grant the insurer discretion in adjudicating

claims, the standard of review is whether the insurer acted in an

arbitrary or capricious manner).

Kenna argues that he is entitled to have inferences drawn in his favor as the party opposing a motion for summary judgment. The Court follows the First Circuit's most recent statement on this issue, which is to the contrary.  See Orndorf v. Paul Revere Life Ins. Co., 404 F.3d 510, 517 (1st Cir. 2005) (stating that "in an ERISA case where review is based only on the administrative record before the plan administrator and is an ultimate conclusion as to disability to be drawn from the facts, summary judgment is simply a vehicle for deciding the issue" and that "the non-moving party is not entitled to the usual inferences in its favor."); Liston v. UNUM Corp. Officer Severance Plan, 330 F.3d 19, 24 (1st Cir. 2003) (same); but see Wright v. R.R. Donnelley & Sons Co. Group Benefits Plan, 402 F.3d 67, 74 (1st Cir. 2005) ("The operative inquiry under arbitrary, capricious or abuse of discretion review is 'whether the aggregate evidence, viewed in the light most favorable to the non-moving party, could support a rational determination that the plan administrator acted arbitrarily in denying the claim for benefits.'"); Twomey v. Delta Airlines Pilots Pension Plan, 328 F.3d 27, 31 (1st Cir. 2003) (same); Leahy, 315 F.3d at 18

(same).[8]

   B.   Alleged Conflict of Interest

   Kenna asserts that Hartford's eligibility determination was
made under a conflict of interest in that a determination in
Kenna's favor would result in payment out of Hartford's own
assets.  Therefore, Kenna argues, the court should adjust its
standard of review to account for the conflict of interest.

   "[A]n insurer does have a conflict of sorts when a finding
of eligibility means that the insurer will have to pay benefits
out of its own pocket."  Pari-Fasano v. ITT Hartford Life &
Accident Ins. Co., 230 F.3d 415, 418 (1st Cir. 2000) (citing
Doyle v. Paul Revere Life Ins. Co., 144 F.3d 181 (1st Cir.
1998)).  But the First Circuit has explicitly rejected the
argument that a conflict based solely on an insurer's dual status
as payor and administrator of the policy's benefits requires the
application of a less deferential standard of review.  See
Wright, 402 F.3d at 75; Glista v. UNUM Life Ins. Co. of Am., 378

---

   [8]The Court notes, however, that after carefully reviewing
the evidence, I do not find that viewing the aggregate evidence
in the light most favorable to Kenna would require a finding that
Hartford's decision was arbitrarily and capricious.  Although
there is evidence that supports Kenna's disability claim, there
is more than sufficient evidence in the record to render
Hartford's decision reasonable.

F.3d 113, 125-26 (1st Cir. 2004).  Since Kenna has not pointed to any other facts that could meet his burden to show that Hartford's eligibility determination was improperly motivated, the Court must apply the arbitrary and capricious standard of review.  See Pari-Fasano, 230 F.3d at 419.  Therefore, the Court must determine whether Hartford's decision to deny Kenna's claim for long-term disability benefits was "objectively unreasonable in light of the available evidence."  Id.

        C.   Submission of Extra-Administrative Record Evidence

        With his objection to Hartford's motion for summary judgment, Kenna submitted an affidavit that attached as exhibits a copy of a Notice of Award from the Social Security Administration ("SSA"), which indicates that Kenna was found to be disabled under the SSA's rules as of November 1, 2002, and a copy of Kenna's business card, which states that the title of his position at Arris was "Senior Program Manager, CPE Product Group."  Kenna asserts in his affidavit that Hartford erroneously considered his position to be that of a "product manager," which Kenna asserts is a different position.  Aff. of Mark J. Kenna, Jr., ¶ 2.  Hartford argues that the Court ought not consider the affidavit and attached exhibits because none of that evidence was

presented to Hartford in the administrative process.

"The ordinary rule is that review for arbitrariness is on the record made before the entity being reviewed." Liston, 330 F.3d at 23.  There is no ironclad rule against the admission of new evidence as part of judicial review.  Id.  The First Circuit has observed that it may be appropriate for the court to hear new evidence where a party challenges the process of decision making as opposed to the substance of the decision.  Orndorf, 404 F.3d at 520; see also Kolling v. Am. Power Conversion Corp., 347 F.3d 11, 14 n.6 (1st Cir. 2003) (noting that the strong presumption that judicial review is limited to the evidentiary record presented to the administrator may not apply in cases involving claims of corruption).  Nonetheless, "at least some very good reason is needed to overcome the strong presumption that the record on review is limited to the record before the administrator."  Liston, 330 F.3d at 23.

While the SSA made its disability determination after Hartford's final decision on Kenna's long-term disability claim, the Court finds that this fact does not constitute sufficient reason for the Court to consider the Social Security Disability determination on judicial review.  Although a determination of

28

disability by the SSA can be relevant evidence when presented timely, see Gannon, 360 F.3d at 215, the mere fact of a Social Security disability award is not binding on insurers and "should not be given controlling weight except perhaps in the rare case in which the statutory criteria are identical to the criteria set forth in the insurance plan." Pari-Fasano, 230 F.3d at 420. There is no evidence that Kenna's case is one of the rare cases in which the eligibility criteria for Social Security benefits is identical to the criteria set forth in the Policy. See Matias-Correa, 345 F.3d at 12 (noting that the claimant was required to satisfy the plan's definition of total disability rather than the SSA's definition). Furthermore, the Notice of Award that Kenna submitted only provides information regarding the payment of benefits. There is no information describing how the Social Security Administration reached its eligibility determination. See Gannon, 360 F.3d at 215.

Since Social Security disability determinations are not binding on disability insurers, and because Kenna made no showing that Hartford's disability determination was governed by standards identical to those used by the Social Security Administration, it was not arbitrary and capricious for Hartford

to reach a different conclusion regarding whether Kenna was disabled than the SSA.

Similarly, Kenna has not offered a sufficient reason for the Court to consider the facts alleged in his affidavit regarding the title of his position at Arris and his business card.  He neither presented that evidence to Hartford during the adjudication of his claim for long-term disability benefits, nor has he provided any explanation of how the difference in job title led to an arbitrary and capricious decision.  See Wright, 402 F.3d at 77-78 (finding that the claimant had the burden to provide evidence that he was unable to perform the essential duties of his occupation and that an integral part of that evidence would have been a statement of what his job required, which the claimant did never submitted).

Having found no good reason to overcome the preference for confining judicial review to the administrative record before the ERISA plan administrator, the Court rules that Kenna's affidavit and the exhibits that he submitted with his Objection are inadmissible.  The Court does not consider that evidence in reaching its decision in this case.

## Discussion

A.   <u>Hartford's Decision That Kenna Was Not Disabled</u>

The first issue that the Court must address is whether Hartford's determination that Kenna was not disabled within the meaning of the Policy was arbitrary and capricious.  The terms "Disabled or Disability" are defined in the Policy to mean "either Totally or Residually Disabled or Total or Residual Disability."  Df.'s Ex. B at 22.  "Totally Disabled" is defined to mean that: (1) during the Elimination Period; and (2) for the next 24 month(s), the employee is prevented from performing the "Essential Duties of Your Occupation."  <u>Id.</u> at 28.  The term "Your Occupation" is defined as "your occupation as it is recognized in the general workplace."  <u>Id.</u>  Therefore, in order to show that he was disabled under the Policy, Kenna was required to show that his condition prevented him from performing the "Essential Duties" of his occupation.  <u>See</u> <u>id.</u> at 7 (the plan participant is required to submit proof of loss satisfactory to Hartford); <u>see</u> <u>also</u> <u>Boardman v. Prudential Ins. Co. of Am.</u>, 337 F.3d 9, 16 (1st Cir. 2003) (finding that the claimant had the burden to demonstrate that his condition rendered him unable to perform the essential duties of his occupation).

1.   <u>Kenna's Duties and Job Requirements</u>

31

Arris indicated that Kenna's job as a Product Manager required occasional standing, walking and sitting, and that it could be performed by alternating sitting and standing.  Admin R. at 304.  Hartford determined that the essential duties and demands of Kenna's occupation as a Product Manager were equivalent to those required of a "Product Development Manager" as defined by the U.S. Department of Labor, and that Kenna's occupation is considered sedentary.  <u>Id.</u> at 286.  Hartford's Rehabilitation Clinical Case Manager further found that as performed in the general workplace, Kenna's occupation would allow for flexibility in positions.  <u>Id.</u> at 64.

> 2.   <u>Evidence of Limitations and Capacity to Work</u>

Dr. Thyng stated in Kenna's application for long-term disability benefits that his illness resulted in Kenna's ability to stand being restricted to five to ten minutes.  <u>Id.</u> at 315. Dr. Thyng stated that Kenna's ability to walk was restricted by both his lower left extremity neuropathy and his left knee pain. <u>Id.</u> Dr. Thyng further indicated that Kenna's walking was very limited due to his pain.  <u>Id.</u>  With regard to Kenna's ability to sit, Dr. Thyng indicated that Kenna required frequent position changes and that he could not sit through meetings.  <u>Id.</u>

There was evidence in the record that supported Hartford's
suspicion of the veracity of Kenna's allegations concerning the
limitations caused by his illness.  Hartford noted that while
Kenna's condition was apparently long-standing, he did not claim
that his condition prevented him from working until November 8,
2002, which was after Arris notified its employees at the
facility where Kenna worked that the facility would be closing on
October 30, 2002.  Cf. Orndorf, 404 F.3d at 525 (finding that the
evidence supported the insurer's determination that a disability
claimant's back pain was not disabling where the claimant had
worked without any physical limitations despite twenty years of
back pain and treatment); Leahy, 315 F.3d at 19 (finding that the
timing of the plaintiff's claim was highly suspicious where the
plaintiff had been working until the time he was laid off and
filed a claim for disability benefits when his salary
continuation benefits were about to expire).  Hartford also noted
Kenna's statements, reported in his medical records in February
and March 2003, that his pain was interfering with his ability to
work.  See id. at 199, 201.  Those statements were made after
Kenna had already stopped working in November 2002.  Hartford
could reasonably conclude from this evidence that Kenna was

motivated to report increased symptoms by the loss of his job.

Under the terms of the Policy, Kenna was required to provide evidence of his "Proof of Loss" that was satisfactory to Hartford in order to establish his claim for long-term disability benefits.  Df.'s Ex. B. at 7.  Dr. Thyng's opinion regarding the physical limitations caused by Kenna's illness was undermined by Dr. Thyng's conversation with Dr. Sniger.  The record shows that Dr. Thyng informed Dr. Sniger that there were no significant objective findings to support Kenna's persistent complaints of pain or his complaint's of impaired concentration secondary to pain.  Id. at 153.  Hartford was entitled to require Kenna to show that objective evidence supported his claim that his illness rendered him unable to work.  See Boardman, 337 F.3d at 16–17 (finding that the claimant failed to submit evidence meeting her burden to show that her illness prevented her from performing the duties of her occupation).  Even where convincing clinical evidence of the existence of an illness may not be shown, an insurer may require that a disability claimant provide objective evidence of the physical limitations imposed by the claimant's symptoms of such illness in order to demonstrate eligibility for benefits.  See id. at 16 n.5.

Kenna's claim that his pain prevented him from working was supported by several statements from Dr. McAvoy, who opined in April 2003 that his and Dr. Stommel's EMG findings demonstrated abnormalities that, along with Kenna's clinical presentation, warranted keeping Kenna out of work indefinitely.  Id. at 140. However, Hartford's independent record reviewers, Drs. Sniger and Mercer, disagreed with Dr. McAvoy's view of the medical evidence. Dr. McAvoy did not respond to questions that Dr. Mercer posed testing the soundness of Dr. McAvoy's opinion. Id. at 73, 76-77.

Dr. Sniger found that Kenna's electrodiagnostic studies were inconsistent.  Dr. Sniger also noted that certain indicators of radiculopathy were absent.  Dr. Sniger noted that Kenna's physicians found that his muscle strength, motor strength and gait were normal.  Id. at 158.  Dr. Sniger further noted that no neuropsychological testing or other objective testing had been done to substantiate that Kenna had a cognitive impairment.  Id. Dr. Sniger further noted that Kenna's mental status exams were normal.  Id.  Based on his review of the evidence, Dr. Sniger concluded that Kenna had the functional capacity to perform sedentary work on a full-time basis.  Id. at 158.

Dr. Mercer likewise concluded that "[o]n an objective basis,

the medical records do not include information that would preclude functioning at a full-time sedentary level with an opportunity to change position as necessary." Id. at 75.  Dr. Mercer found that the evidence revealed "no new abnormal findings on examination subsequent to November of 2002 as compared to the previous examination of August of 2002." Id.  Similarly, Dr. Mercer found that "there is no objective data to support that [Kenna's] concentration/cognitive function is being impaired by his pain to the extent that it would preclude working." Id.

In an ERISA case, "[t]he opinion of the claimant's treating physician . . . is not entitled to special deference." See Orndorf, 404 F.3d at 526 (citing Black & Decker Disability Plan v. Nord, 538 U.S. 822, 831 (2003)); Garcia v. Raytheon Employees Disability Trust, 122 F. Supp. 2d 240, 245 (D.N.H. 2000) (finding that "as a general matter, a plan administrator is not required to give controlling weight to the opinion of a treating physician").  Moreover, there is no requirement that the insurer have its independent physicians examine the claimant.  A denial of benefits "may be based on review of medical records submitted by the claimant." Orndorf, 404 F.3d 526; see also Garcia, 122 F.Supp. 2d at 246 (a plan administrator may rely on the opinion

36

of a non-examining physician in making an eligibility determination).

As discussed above, Hartford had reason to find Kenna's claim of disabling pain suspicious in light of the timing of his claims.  And the record supports Hartford's determination that the objective medical evidence did not support Kenna's claim that he was disabled under the policy.  The record further shows that there was disagreement, even among Kenna's own physician's, regarding whether any objective evidence supported Kenna's claim. Dr. Thyng agreed with Drs. Sniger and Mercer that the evidence did not support Kenna's claim from an objective perspective. Furthermore, Drs. Sniger and Mercer challenged Dr. McAvoy's opinion that the objective evidence showed that Kenna was disabled as of the time his coverage under the Policy terminated. "The mere presence of a conflict" between the opinions of Kenna's treating physicians and Hartford's non-examining medical records reviewers does not render Hartford's decision arbitrary or capricious.  Garcia, 122 F. Supp. 2d at 246; see also Matias-Correa, 345 F.3d at 12 (noting that it is not the court's role to evaluate how much weight an insurer should have accorded the opinion of an independent medical consultant relative to the

opinion of a claimant's own physicians).  The Court finds that
Hartford's decision to deny Kenna's claim for long-term
disability benefits was supported by substantial evidence and was
reasonable.

Kenna argues that Hartford's decision on his claim was
arbitrary and capricious because the short-term disability
insurance carrier found that Kenna was disabled and entitled to
benefits based on the same condition that was the subject of his
long-term disability claim and because Hartford did not
adequately considered the opinion of Dr. Rind.  The Court finds
these argument unpersuasive.

Kenna asserts that the Policy terms provided that Kenna's
coverage would continue if he was receiving short-term disability
benefits at the time his employment terminated.  See Pl.'s
Objection at 10.  While receipt of short-term disability benefits
is referenced in the Policy with regard to the determination of
the Elimination Period, the Policy's definition of "Disabled"
makes no reference a plan participant's receipt of short-term
disability benefits.  As discussed supra, the Policy requires
that the participant be prevented from performing the "Essential
Duties of [His or Her] Occupation."  Under the terms of the

Policy, Hartford had the discretion and authority to determine
Kenna's eligibility for benefits and to require Proof of Loss
satisfactory to Hartford.  Df.'s Ex. B at 7, 22.  In such
circumstances, Hartford was not bound by the decision of a short-
term benefits insurer.  See e.g., Morris v. Metro. Life Ins. Co.,
No. 03-265-B, 2005 DNH 86 at *1-2 (D.N.H. May 24, 2005)
(affirming denial of an application for long-term benefits in a
case where the claimant had been granted short-term benefits).
To find otherwise would deprive Hartford of the discretion
granted to it under the Policy.

       Kenna further argues that Hartford's erroneously found that
Dr. Rind's independent medical examination, conducted in
September 2003, was not relevant because Kenna was no longer
insured at that time.  Kenna argues that he was actually disabled
from working during that time and entitled to receive short-term
disability benefits until his long-term benefits commenced.  This
argument also fails because substantial evidence supports
Hartford's determination that Kenna was not disabled when his
long-term disability coverage terminated.

       Under the terms of the Policy, Kenna's coverage for long-
term disability benefits terminated when he ceased to be an

Active Full-time Employee.  Df.'s Ex. B. at 16.  Since Kenna went on a twelve-week leave of absence, Hartford determined that Kenna's coverage was extended until the expiration of his leave on January 30, 2003.  The Policy provides that a plan participant's coverage would be continued if the participant ceases to be an "Active Full-time Employee" because he or she becomes "Disabled."  The Court finds, however, that Hartford's determination that Kenna was not disabled at the time his leave of absence ended is supported by substantial evidence.  The continuation of Kenna's short-term disability benefits after the expiration of his leave does not affect the result.

     B.   <u>Whether Hartford Violated 29 U.S.C. § 1132(c)</u>

The second issue that the Court must address is whether Hartford violated 29 U.S.C. § 1132(c) by failing to provide Kenna with information and documents that he requested on October 30, 2003.  Kenna seeks the imposition against of civil penalties against Hartford under the statute.

Under 29 U.S.C.A. § 1024(b) and 29 C.F.R. § 2520.104b-1, the administrator of a plan covered by ERISA is required to furnish to plan participants or beneficiaries a copy of the summary plan description.  As defined by the statute, the term "administrator"

40

means "the person specifically so designated by the terms of the instrument under which the plan is operated."  29 U.S.C.A. § 1002(16)(A)(i).  In this case, Arris was designated as the Plan Administrator.  See Df.'s Ex. B at 62.

Kenna does not contest Hartford's argument that Arris, as Plan Administrator, and not Hartford, was the party obligated to provide Kenna a copy of the summary plan description.  See Sunderlin v. First Reliance Std. Life Ins. Co., 235 F. Supp. 2d 222, 237 (W.D.N.Y. 2002) (the responsibility to provide a summary plan description lies solely with the plan administrator, or if no plan administrator is designated then the plan sponsor; it is not the responsibility of other plan fiduciaries); see also Lee v. Burkhart, 991 F.2d 1004, 1010 (2d Cir. 1993) (same); Davis v. Liberty Mut. Ins. Co., 871 F.2d 1134, 1138 (D.C. Cir. 1989) (same).  Moreover, there is no dispute that Hartford provided Kenna, through his counsel, a copy of the Long Term Disability Policy booklet and a copy of Kenna's entire long-term disability claim file.  Kenna does not argue that he suffered any prejudice by his inability to obtain a copy of the summary plan description from Hartford.  The Court finds that no penalties against Hartford are warranted under the facts of this case.

<u>Conclusion</u>

For the reasons set forth above, the Court finds that Hartford's determination that Kenna was not disabled within the meaning of the policy at issue was not arbitrary and capricious. The Court further finds that Kenna has not demonstrated that penalties are warranted against Hartford for an alleged failure to provide certain welfare benefit plan documents.  Accordingly, Defendant's Motion for Summary Judgment (document no. 9) is granted.  The Clerk of Court is directed to enter judgment in Defendant's favor and close the case.

**SO ORDERED.**

_____
James R. Muirhead
United States Magistrate Judge

Date: September 6, 2005

cc:  Gary L. Casinghino, Esq.
     John-Mark Turner, Esq.